## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ADRIANA MEZA,<br><br>           Plaintiff,<br><br>v.<br><br>JACKSON TOWNSHIP; CHIEF OF POLICE MATTHEW KUNZ; OFFICER RYAN DONNELY; OFFICER KYLE STYBE; SERGEANT MICHAEL FRIEDMAN; OFFICER SHANNON FOOTE; OFFICER TRISTAN BENNET; OFFICER SHANE DAVIS; AND JOHN DOES 1-10<br><br>           Defendants. | Case No. 3:18-cv-15206 (BRM) (DEA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Officer Tristan Bennett ("Officer Bennett"), Officer Shane Davis ("Officer Davis"), Officer Ryan Donnelly ("Officer Donnelly"), Officer Shannon Foote ("Officer Foote"), Sergeant Michael Friedman ("Sergeant Friedman"), Jackson Township, Chief of Police Matthew Kunz ("Chief Kunz"), and Officer Kyle Stybe's ("Officer Stybe") (collectively "Defendants") Motion for Summary Judgment. (ECF No. 17.) Adriana Meza ("Plaintiff") opposed the motion (ECF No. 19) and Defendants replied (ECF No. 20). Having reviewed the parties' submissions filed in connection with the motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### A.    Factual Background

On December 11, 2016, Plaintiff and her husband were watching football when they heard someone repeatedly banging on the front door to their home. (ECF No. 17-1 ¶ 2.) When Plaintiff confronted the individual banging on the door, she discovered it was Officer Donnelly, an officer from the Jackson Township Police Department, who was responding to a noise complaint at Plaintiff's home. (*Id.*) The video footage[2] of Plaintiff's front door security camera shows Officer Donnelly banging on Plaintiff's door three times, waiting for a response for about 20 seconds, and

---

[1] This background is taken from the parties' statements of material facts, pursuant to Local Civil Rule 56.1. (*See* ECF No. 17-1, Defendants' Statement of Undisputed Material Facts, which is included in Defendants' Brief in Support of its Motion for Summary Judgment; and ECF No. 19, Plaintiff's Response to Defendants' Statement of Undisputed Material Facts and Supplemental Statement of Disputed Material Facts.) However, Defendants' Statement of Undisputed Material Facts has two main components: (1) a rehashing of Plaintiff's allegations in her Complaint; and (2) excerpts from the officers' depositions. To present a coherent factual picture, the Court will recount the events giving rise to this action, in chronological order, through Plaintiff's home security footage and the officers' depositions. To the extent Plaintiff admits to any material facts stated by Defendants, the Court will cite only to Defendants' Statement of Undisputed Materials Facts and the relevant paragraph number.

[2] Plaintiff submitted home security footage as an exhibit attached to her opposition. (Home Security Video Footage, Ex. A-1 (ECF No. 19-2).) In Plaintiff's response to Defendant's Statement of Undisputed Material Facts, she repeatedly states the video is self-explanatory or speaks for itself. (*See* ECF No. 19 ¶¶ 3, 4, 14, 18, 19, 20.) Defendants do not dispute the events displayed in the video, and instead argue they "believe the video and their moving [b]rief sufficiently refutes [Plaintiff's]" allegations. (ECF No. 20 at 1.) That is, neither party disputes the authenticity of the video footage, but both parties offer contrasting legal conclusions based on the events depicted in the video. The Court will consider this video footage in ruling on the present motion. *See Rodriguez v. New Jersey*, Civ. A. No. 18-11166, 2021 WL 165106, at *1 (D.N.J. Jan. 19, 2021) ("The facts as depicted in the videotape are included because the video is part of the record and, therefore, the Court must rely on the video in ruling on summary judgment." (citing *Scott v. Harris*, 550 U.S. 372, 381 (2007))); *see also Gunter v. Gray*, Civ. A. No. 17-4217, 2020 WL 4364295, at *3 (D.N.J. July 30, 2020) ("As such, the Court has reviewed the video footage for purposes of this Motion for Summary Judgment and objectively summarizes the elements of the footage that cannot be 'reasonably' disputed.").

then banging another dozen times. (Ex. A-1 (ECF No. 19-2) at 0:00:00–0:00:34.) Plaintiff subsequently opened the door and exchanged words with Officer Donnelly, who proceeded to speak into his radio. (*Id.* at 0:00:34–0:00:50.) However, Officer Donnelly testified[3] that Plaintiff started to yell and curse at him while he was asking for Plaintiff's identification. (Donnelly Dep. (ECF No. 17-9) at 43:11–21.) He also testified Plaintiff started to close the door and "[t]hat's when [he] moved forward and put [his] foot in [the door], and that motion of stopping the door for a moment then caused both [Plaintiff and her husband] to start pushing [back against the door]." (*Id.*) Plaintiff testified that Officer Donnelly "tried to push the door open." (Plaintiff Dep. by Plaintiff's Counsel, Ex. B (ECF No. 19-2) at 50:17–22.) Then, after Plaintiff and Officer Donnelly were pushing back and forth on the door, Officer Donnelly testified that Plaintiff "kicked [his] leg." (ECF No. 17-9 at 45:7–11.) Plaintiff testified neither she nor her husband kicked Officer Donnelly. (ECF No. 19-2 at 51:3–7.) Additionally, the video footage of Plaintiff's front door does not show Plaintiff or her husband making any contact with Officer Donnelly. (Ex. A-1, ECF No. 19-2 at 0:00:00–0:00:54.) However, the footage does show an encounter between Officer Donnelly, Plaintiff, and her husband when they first open the door—a struggle ensued as Officer Donnelly, Plaintiff, and her husband fight for control of the door, but then the video footage stops. (ECF No. 19-2 at 0:24:36–0:24:56.)

After this encounter, Officer Donnelly called for backup on his radio and retreated from the door. (ECF No. 19-2 at 51:17–22; ECF No. 17-9 at 50:13–15.) Sergeant Friedman, Officer

---

[3] While the Court will provide the officers' deposition testimony as part of the record, it will not make any credibility determinations about such testimony. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))).

Bennett, Officer Davis, Officer Foote, and Officer Stybe came in as backup with the plan of arresting Plaintiff for assaulting Officer Donnelly. (ECF No. 17-9 at 50:19–22, 51:24–25, 52:1–3.) When the officers arrived at Plaintiff's door and informed her she was under arrest, she started to back away from the door. (ECF No. 17-9 at 56:4–7.) Officer Donnelly testified, consistent with the video footage, that Officer Stybe was the first to grab Plaintiff, and Officer Donnelly was the second officer to enter the home. (*Id.* at 56:18–23; Ex. A-1, ECF No. 19-2 at 0:09:04–0:09:06.) Officer Stybe was the first to take Plaintiff to the ground. (ECF No. 17-9 at 56:24–25; Ex. A-1, ECF No. 19-2 at 0:09:06–0:09:09.) Officer Donnelly testified that once Plaintiff was on the ground, she was resisting arrest because "she refused to take her arms out from underneath her [and refused] to follow [the officers'] command[s] so that they [could] place her in handcuffs." (ECF No. 17-9 at 59:9–14.) The video footage is unclear as to whether Plaintiff was resisting arrest—after she backs away from the door, an officer proceeds towards her. Plaintiff then backs into a wall, goes to the ground, and is dragged around on the ground by two officers, who eventually force her over to the staircase in Plaintiff's home. (Ex. A-1(ECF No. 19-2) at 0:09:00–0:09:20.) While Plaintiff argues "the footage does not show [her] falling on her back as [Officer Stybe] reaches to grab her," (ECF No. 19-2 at 9), Sergeant Friedman testified "it appeared to me that she tripped over her own feet or over—I'm not sure if there [was] something on the floor [that made Plaintiff fall] backwards." (Sergeant Friedman Dep. (ECF No. 17-12) at 23:24–25; 24:1–2.) Once Plaintiff was forced over to the staircase, the video footage shows her surrounded by two officers, then two additional officers rush in. (Ex. A-1, (ECF No. 19-2) at 0:09:20–0:09:23.) Officer Bennett, one of the two additional officers to rush in, delivered two punches to Plaintiff's head. (*Id.* at 0:09:27.) After that, Plaintiff was handcuffed and walked out of her home. (*See id.*)

Officer Bennett admitted he struck Plaintiff "twice with a closed fist in the temple." (ECF No. 17-1 ¶ 19(a).)

Defendants' Statement of Undisputed Material Facts features numerous excerpts from each of the depositions taken in this action. (*See id.* ¶¶ 14–20.) Instead of providing the deposition excerpts in full, the Court will summarize them and provide the parts Plaintiff disputes.

### i. Plaintiff's Deposition Testimony

Plaintiff testified that Officer Donnelly was the one that initially came to her door in response to a noise complaint and was very rude because he kept knocking very hard. (*Id.* ¶ 14(a).) However, she could not identify specifically what Officer Donnelly did in terms of physical contact. (*Id.*) Regarding Officer Bennett, Plaintiff testified he punched her in the face when she had her hands behind her back. (*Id.* ¶ 14(e).) Plaintiff could not identify who Officer Davis was. (*Id.* ¶ 14(f).) Plaintiff explained the reason why she could not accurately describe the conduct of each individual officer was because they all "band rushed" her and threw her around. (*Id.* ¶ 14(g).) Plaintiff also states she discovered the reason Officer Donnelly was at her house was because of a noise complaint through the summons she received a week after the incident. (*Id.* ¶ 14(h).) Regarding her "culpable conduct," Plaintiff testified the noise complaint and resisting arrest charges were dismissed in county court, but she took "PTI" for hitting Officer Donnelly.[4] (*Id.* ¶ 14(i).)

---

[4] Plaintiff admits the facts provided throughout Paragraph 14, but clarifies the facts given. Plaintiff submits the following: "Other than Officer Donnelly and Bennett, Plaintiff was unaware of which officers participated in the excessive force . . . . Defendant Donnelly . . . admitted that he banged on the door. The video in this case clearly shows him participating in the gang tackling and excessive force used upon Plaintiff." (ECF No. 19 ¶ 14.)

### ii. Chief Kunz's Deposition Testimony

Chief Kunz testified that Jackson Township police officers are instructed to only use reasonable force on citizens during an arrest. (*Id.* ¶ 15(c).) In training the officers, Chief Kunz follows the attorney general guidelines on annual inspection in all areas, including use of force. (*Id.*) The officers receive use of force training at the police academy and are taught using excessive force would violate a person's civil rights. (*Id.*) Also at the academy, officers were taught that they were required to intervene when another officer was using excessive force. (*Id.*) After being shown the video of Plaintiff being punched in the head twice, Chief Kunz testified he could not conclude whether the officers' actions were proper just from viewing the video.[5] (*Id.* ¶ 15(e).)

### iii. Officer Foote's Deposition Testimony

Officer Foote testified he did not physically touch Plaintiff, did not see Officer Bennett punch Plaintiff, and did not even become aware of the fact that Officer Bennett punched Plaintiff during the encounter. (*Id.* ¶ 16(a).) Officer Foote stayed with Plaintiff's husband while Plaintiff was being arrested, but knew she was being arrested and could hear what was going on. (*Id.*) Officer Foote also received use of force training, was taught that he was obligated not to use excessive force, and was told using excessive force or failing to intervene when another officer was using excessive force would constitute a violation of a person's civil rights.[6] (*Id.* ¶ 16(b).)

---

[5] Plaintiff points out "[w]hen questioned about the video in this case, Defendant Kunz is unable to testify that excessive force was or was not utilized by his officers and he was unable to testify regarding whether the fact that Defendant Officer Bennett punched Plaintiff in the face was justified." (ECF No. 19 ¶ 15.)

[6] Plaintiff admits this, but notes: "[i]t is Plaintiff's position that Officer Foote failed to intervene while excessive force was utilized on Plaintiff by members of the Jackson Township Police Department." (ECF No. 19 ¶ 16.)

### iv.     Officer Donnelly's Deposition Testimony

Officer Donnelly testified he responded to a call at Plaintiff's home for a noise complaint due to loud music. (*Id.* ¶ 17(a).) He had to pound on the door to get the attention of Plaintiff, which upset her. (*Id.*) Both Plaintiff and her husband started to yell at Officer Donnelly after he asked for their identification. (*Id.*) Plaintiff and her husband then began to close the door on Officer Donnelly which caused him to put his foot in between the door and its frame. (*Id.*) He also testified Plaintiff assaulted him by pushing his arm away and kicking at him. (*Id.*) Officer Donnelly was the only officer at the scene during this initial encounter, but after he was allegedly assaulted by Plaintiff, he called in back up to carry out the arrest of Plaintiff for the alleged assault. (*Id.*) The plan was to inform Plaintiff she was under arrest and ask her to come outside, but when they attempted to execute this plan, she started to back away from the door. (*Id.*) Officer Stybe then entered, took Plaintiff to the ground, and dragged her over to the staircase. (*Id.*) After this, Officer Donnelly got involved and starting using physical force. (*Id.*) Officer Donnelly agreed he and the other officers used physical force from the "get-go" upon entering the house, because "[w]hen somebody resists arrest, then we use physical force." (*Id.*) He also testified the level of force used on Plaintiff was used because "once Officer Stybe attempted to effectuate the arrest by putting his hand on her arm, she physically fought back and resisted." (*Id.*) Plaintiff "was told several times that she was under arrest[,] to put her hands behind her back[,] and [to] stop resisting." (*Id.*) Like the other officers, Officer Donnelly received use of force training, was taught using excessive force would violate another person's civil rights, and was told he had a duty to intervene if he saw another officer using excessive force. (*Id.* ¶ 17(b).) At the Jackson Township Police Department, Officer Donnelly was given use of force training and "a refresher [on] several things."[7] (*Id.*)

---

[7] Plaintiff admits the portions of the testimony provided by Defendants, but notes:

Officer Davis testified, "from [his] understanding," the officers were there "to make an arrest because [Plaintiff] had assaulted an officer as a result of [a] noise complaint that had gotten out of control." (*Id.* ¶ 18(a).) Initially, Officer Davis went to the back of the house with Officer Bennett, but when they heard "a commotion in the front," both officers ran back around to the front door and saw Plaintiff "struggling with officers on the ground [who were] trying to effect arrest." (*Id.*) He thought "three officers was more than enough to effect the arrest" so he "did not get involved." (*Id.*) He felt that if he "got involved with the other three officers, that would have been excessive for the case." (*Id.*) Officer Davis saw Officer Bennett throw "one punch as fast as we came through [the front door]." (*Id.*) According to his testimony, Officer Davis did not intervene to stop the punch because "that would have been some real immediate action" as the punch happened "instantaneously." (*Id.*) He also testified Plaintiff was in handcuffs in under a minute. (*Id.*) As to training, Officer Davis, like the other officers, was taught about the duty to intervene and received training about that duty while working at the Jackson Township Police Department.[8] (*Id.* ¶ 18(b).)

---

                Officer Donnelly utilized excessive force on more than one occasion during his encounter with Plaintiff. Initially, he used excessive force when trying to drag Plaintiff from her home. He then used excessive force after conferring with officers on the front lawn and then entering Plaintiff's home, and, with the assistance of other officers, tackling her to the ground after she opened the door.

(ECF No. 19 ¶ 17.)

[8] Plaintiff does not appear to admit or deny the excerpts provided by Defendants. However, Plaintiff notes "Officer Davis entered the house with Officer Bennett. Defendant Officer Davis observed Defendant Bennett punching Plaintiff. Officer Davis also observed other officers using excessive force upon Plaintiff and failed to intervene in any way, shape, or form." (ECF No. 19 ¶ 18.)

### vi.    Officer Bennett's Deposition Testimony

Officer Bennett testified he heard a lot of officers yelling "stop resisting," so he ran to the front door and assisted in handcuffing Plaintiff. (*Id.* ¶ 19(a).) He was the first to enter after reaching the front of the house and "noticed two officers . . . on a female." (*Id.*) Plaintiff was lying face down on the ground by the [staircase], with her hands underneath her. (*Id.*) The other officers "were trying to pull her hands out so they could . . . put the cuffs behind her back." (*Id.*) Officer Bennett went over to Plaintiff and tried pulling on her elbow to get her hands free. (*Id.*) Because he was unable to get her hands out from under her, he "struck her in the face with [his] right hand twice" and then was able to make "the arrest and [get] her out of the house." (*Id.*) The testimony clarifies he struck Plaintiff "twice with a closed fist in the temple." (*Id.*) With regard to training, Officer Bennett received use of force training, was taught using excessive force would violate another's rights, and was taught he had a duty to intervene if another officer was using excessive force.[9] (*Id.* ¶ 19(b).)

### vii.    Sergeant Friedman's Deposition Testimony

Sergeant Friedman testified he first became involved with Plaintiff's arrest when the police headquarters received a call for back up from Officer Donnelly. (*Id.* ¶ 20(a).) He stated Officer Donnelly "claims that he was pushed" and kicked in "either his foot or leg." (*Id.*) When he and Officer Donnelly advised Plaintiff she was under arrest, she started backpedaling and tried to close the door. (*Id.*) At some point, "it appeared to [Sergeant Friedman] that she tripped over her feet or over . . . something on the floor, and fell backwards." (*Id.*) He then "reached down to grab her arm

---

[9] Plaintiff admits the deposition excerpts provided by Defendants, and notes "[t]he incident in this case is . . . depicted in the video which has been supplied as Exhibit A. There was absolutely no justification provided for punching Plaintiff in the face. Defendant Bennett clearly admits that he punched her twice in the face." (ECF No. 19 ¶ 19.)

to assist in securing her handcuffs." (*Id.*) Sergeant Friedman did not think preparing a use of force report for grabbing Plaintiff's arm was necessary, since "that would have been a routine procedural contact." (*Id.*) He testified he "didn't take her to [the] ground" because "[s]he went down on her own." (*Id.*) He did not witness Officer Bennett punch Plaintiff because he was not involved in the arrest at that point. (*Id.*) Sergeant Friedman was also taught using excessive force violates a person's constitutional rights, officers have a duty to intervene when another officer is using excessive force, and failing to intervene can result in a criminal charge.[10] (*Id.*)

### viii.    Officer Stybe's Deposition Testimony

Officer Stybe testified Officer Donnelly, when trying to get information from the homeowners, "got in contact with the homeowners, and was [met] with [a] bit of hostility," which resulted in him getting kicked. (*Id.* ¶ 21(a).) When Officer Donnelly identified Plaintiff as the person who kicked him, Officer Stybe informed Plaintiff she was under arrest, and then "she began acting a bit erratically and began retreating back into the house." (*Id.*) Officer Stybe then "stepped into the residence to gain control of her." (*Id.*) He did not see Officer Bennett punch Plaintiff. (*Id.*)

---

[10] Plaintiff admits the truth of the deposition transcripts provided by Defendants, but notes:

> [a]ll the officers . . . stat[e] that Plaintiff tried to close the door on the officers who came as backup to Defendant Donnelly. The video speaks for itself in this case. There is no point in the video where she is seen attempting to close the door on these officers. She is seen backing up and that is all. She was then tackled to the ground and then dragged over to the stairwell where she was handcuffed. During that process, she was punched twice in the face by Officer Bennett. Officers in this case have also testified that Plaintiff went to the ground on her own. The video in this case speaks for itself. She was tackled to the ground. She was a victim of excessive force. She was injured as a result of this excessive force.

(ECF No. 19 ¶ 20.)

He also was taught about the use of excessive force and about intervening if another officer used excessive force. (*Id.* ¶ 21(b).)

**B.   Procedural History**

On October 23, 2018, Plaintiff filed her Complaint alleging a violation of the Fourth Amendment due to excessive force by Officer Stybe, Sergeant Friedman, Officer Donnelly, and Officer Bennett under 42 U.S.C. § 1983 (Count I); failure to intervene by Officer Foote, Officer Donnelly, and Officer Davis under 42 U.S.C. § 1983 (Count II); violation of the New Jersey State Constitution and New Jersey Civil Rights Act by Officer Donnelly, Officer Stybe, Sergeant Friedman, Officer Foote, Officer Bennett, and Officer Davis (Count III); unlawful policy or failure to train, supervise and discipline under 42 U.S.C. § 1983 (a *Monell* claim) against Jackson Township (Count IV); and a "failure to train, supervise and discipline unconstitutional practices" claim under 42 U.S.C. § 1983 alleging supervisor liability against Chief Kunz, Sergeant Friedman, and John Does 1-10 (Count V). (ECF No. 1.) On January 8, 2019, Defendants answered the Complaint. (ECF No. 3.) On September 29, 2020, Defendants filed a Motion for Summary Judgment. (ECF No. 17.) On November 2, 2020, Plaintiff opposed (ECF No. 19) and on November 10, 2020, Defendants replied (ECF No. 20.)

**II.   LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes

over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).]

However, the existence of video footage here presents an "added wrinkle" to the normal standard requiring courts "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted). In *Scott*, the Court instructed "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. That is, courts should view "the facts in the light depicted by the videotape." *Id.* at 380–81; *see also Knight v. Walton*, 660 F. App'x 110, 112 (3d Cir. 2016) ("Where there is a video recording of the relevant events, the Court views the facts as depicted in the recording, rather than in the non-movant's favor, whenever the recording 'blatantly contradict[s]' the non-movant's version such that 'no reasonable jury could believe it.'" (quoting *Scott*, 550 U.S. at 380–81)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if

the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

Pursuant to Federal Rule of Civil Procedure 56(d),

> [i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
>> (1) defer considering the motion or deny it;

13

> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

A party who submits an affidavit pursuant to Rule 56(d) must "specify[], for example, what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." *Penn., Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 157 (3d Cir. 2012) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 139–40 (3d Cir. 1988)). If the nonmovant

> files an affidavit that addresses these three requirements with specificity, and especially when particular information, necessary to the successful opposition to summary judgment, is in the sole possession of the moving party, the Third Circuit has held that 'a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.'

*Malouf v. Turner*, 814 F. Supp. 2d 454, 459 (D.N.J. 2011) (quoting *Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984)). However, the nonmovant cannot defeat summary judgment by offering "[v]ague or general statements of what [it] hopes to gain through a delay for discovery." *Id.* at 459–60 (citing *Hancock Indus. v. Schaffer*, 811 F.3d 225, 230 (3d Cir. 1987)).

This governing standard does not change when the parties file cross-motions for summary judgment. *Hartford Cas. Ins. v. Peerless Ins.*, Civ. A. No. 10-6235, 2016 WL 5723659, at *4–5 (D.N.J. Sept. 30, 2016). Indeed, "[t]he court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citations omitted); *Arzadi v. Evanston Ins.*, Civ. A. No. 17-5470, 2018 WL 747379, at *2 (D.N.J. Feb. 7, 2018).

### III. DECISION

Plaintiff brings the following claims under 42 U.S.C. § 1983: (1) an excessive force claim (Count I); (2) a failure to intervene claim (Count II); (3) an unlawful policy or custom, failure to train, supervise and discipline *Monell* claim (Count IV); and (4) a failure to train, supervise, and discipline claim through supervisor liability (Count V). She also alleges violations of the New Jersey State Constitution and New Jersey Civil Rights Act. (Count III.) (ECF No. 1.)

#### A. Plaintiff's § 1983 Claims

Defendants maintain each of the § 1983 claims against the officers in their individual capacity should be dismissed as a matter of law because they are entitled to qualified immunity. (ECF No. 17-1 at 36–41.)

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Montanez v. Thompson*, 603 F.3d 243, 249–50 (3d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. This doctrine provides a government official immunity from suit rather than a mere defense from liability. *Id.* Qualified immunity will not, however, act as a shield for "the official who knows or should know he is acting outside the law." *Butz v. Economou*, 438 U.S. 478, 506–07 (1978).

To determine whether the officers named as defendants are entitled to qualified immunity, the Court must undertake a two-step inquiry:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.

Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

*Pearson*, 555 U.S. at 232 (citations omitted). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Couden v. Duffy*, 446 F.3d 483, 492 (2006) (quoting *Saucier*, 533 U.S. at 202). "If the officer's mistake as to what the law requires is reasonable, the officer is entitled to qualified immunity." *Id.* (internal citations omitted). Further, "if officers of reasonable competence could disagree on th[e] issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). Regarding the second requirement, "[b]ecause the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau*, 543 U.S. at 198. "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (citation omitted). "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* "Finally, because qualified immunity is an affirmative defense, the burden of proving its

applicability rests with the defendant." *Carpenter v. Chard*, 492 F. Supp. 3d 321, 330 (D.N.J. 2020) (citing *Beers–Capital v. Whetzel*, 256 F.3d 120, 142, n.15 (3d Cir. 2001)).

### i.    Plaintiff's § 1983 Excessive Force Claim

Defendants argue Officers Stybe, Friedman, Donnelly, and Bennett did not use excessive force when they arrested Plaintiff. (ECF No. 17-1 at 46.) Defendants assert Officer Donnelly "only assisted his fellow [o]fficers in making the arrest" of Plaintiff and "[t]here are no facts in the record which could support Plaintiff's factual allegation that Officer Donnelly struck her." (*Id.* at 48–49.) As to Officer Stybe and Sergeant Friedman, Defendants contend both officers, "viewing the lights most favorable to the plaintiff," forced Plaintiff to the ground to effectuate her arrest, which does not constitute excessive force. (*Id.* at 49.) Lastly, Defendants contend Officer Bennett's two punches to Plaintiff's head "[were] not egregious enough to become actionable as a violation to Plaintiff's [F]ourth [A]mendment rights" because she was "actively resisting arrest." (*Id.* 50–51.) Plaintiff argues Defendants' Motion for Summary Judgment should be denied because genuine issues of material fact exist as to the reasonableness of the force used by Defendants against Plaintiff in effectuating her arrest. (ECF No. 19-1 at 2–9.)

"An excessive force claim under § 1983 arising out of law enforcement conduct is based on the Fourth Amendment's protection from unreasonable seizures of the person." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)). "A cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution." *Id.* at 633–34 (citing *Brown v. Borough of Chamberburg*, 903 F.2d 274, 277 (3d Cir. 1990)). When, as here, the excessive force alleged occurred in the course of an arrest, investigatory stop, or other "seizure" of a free citizen, the test of "reasonableness" used by the

Court requires an assessment, under the totality of the circumstances, of whether an "officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." *Graham*, 490 U.S. at 397. Evaluating the objective reasonableness of the police conduct "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. In this case, summary judgment is appropriate if, "as a matter of law, the evidence would not support a reasonable jury finding that the police officers' actions were objectively unreasonable." *Groman*, 47 F.3d at 634.

The issue is whether the officers' uses of force were reasonable under the circumstances, which will be analyzed under the *Graham* factors. *See Graham*, 490 U.S. at 396. First, the Court will address the severity of the crime at issue. *See id.* Officer Donnelly initially arrived at Plaintiff's home in response to a noise complaint, a crime that he admits, by itself, he "didn't have a right to enter the house for." (ECF No. 17-9 at 47:13–17.) And while Officer Donnelly also testified he would have a right to enter after the alleged assault (ECF No. 17-9 at 48:1–3), Plaintiff disputes she made any contact with Officer Donnelly, and the video footage does not show any contact between Officer Donnelly and Plaintiff or her husband during the initial encounter. While Plaintiff was charged with aggravated assault and resisting arrest, "she was admitted into the PTI program[11] and all charges against her were ultimately dismissed." (ECF No. 19-1 at 9.) Because the parties provide conflicting evidence about whether Plaintiff assaulted Officer Donnelly, which necessarily

---

[11] The Court notes here Plaintiff's enrollment in the PTI program does not bar her § 1983 claim. *Day v. Jackson Twp.*, Civ. A. No. 10-4011, 2013 WL 394151, at *6 (D.N.J. Jan. 30, 2013) ("Cases within the District and Circuit have held that a conviction/plea/PTI enrollment resulting from an assault on a police officer and/or resisting arrest are not an absolute bar to a plaintiff's § 1983 excessive force claim because a police officer can still be found to have used excessive force.").

impacts whether the crime at issue is a simple noise complaint or the more serious crime of assaulting a police officer, summary judgment is not appropriate. Accepting Plaintiff's evidence, as the Court must at this stage, a reasonable jury could find that Plaintiff did not assault Officer Donnelly. *Kaucher*, 455 F.3d at 423.

Next, Plaintiff argues she "posed no threat to Defendants" and "was not violent or dangerous." (ECF No. 19-1 at 10.) Defendants make no argument under this *Graham* factor. (*See* ECF No. 17-1 at 46–51.) When the officers came into Plaintiff's house a second time, the footage simply shows Plaintiff backpedaling from the door—Plaintiff did not attack any of the officers, nor did she have any weapons on her. (Ex. A-1 (ECF No. 19-2) at 0:09:00–0:09:20.) Accepting Plaintiff's version of the events, a reasonable jury could find Plaintiff was not a threat to the arresting officers. *See, e.g.*, *Faragalla v. Jersey City*, Civ. A. No. 2:17-03604, 2020 WL 5812798, at *7 (D.N.J. Sept. 30, 2020) (finding that "a reasonable jury could conclude that [whether Faragalla posed an immediate threat to the officers] weighs in Faragalla's favor" when "in Faragalla's version of events, he was sitting inside his car without any weapons when the use of force began"); *c.f. Cabrera v. Camden Cnty.*, Civ. A. No. 16-05653, 2019 WL 3761128, at *8 (D.N.J. Aug. 9, 2019) (providing that "the undisputed record shows that the officers discharged their weapons because Baez fired at them . . . and posed an immediate threat to their safety").

Regarding the third *Graham* factor, "whether [Plaintiff] is actively resisting arrest or attempting to evade arrest by flight," 490 U.S. at 396, Defendants argue "[t]he undisputed facts and video establish that Plaintiff was physically resisting arrest," and "was actively resisting arrest while laying on the ground." (ECF No. 17-1 at 49, 50.) Plaintiff contends she "was not resisting arrest." (ECF No. 19-1 at 10.) Officer Donnelly testified Plaintiff was resisting arrest because "she refused to take her arms out from underneath her [and refused] to follow [the officers']

command[s] so that they could place her in handcuffs." (ECF No. 17-9 at 9–14.) The video footage is unclear as to whether Plaintiff was resisting arrest—after she backed away from the door, an officer started to proceed towards her. Plaintiff then backs into a wall, goes to the ground, and is dragged on the ground by two officers, who eventually force her over to the staircase. (Ex. A-1 (ECF No. 19-2) at 0:09:00–0:09:20.) The portion of the footage offering this view does not have audio, so the Court cannot determine—despite the officers' testimony—whether the officers were shouting "stop resisting." (ECF No. 17-9 at 61:10–62:14.) Either way, the force used on Plaintiff— the two punches to her head, after already being restrained by four officers on the staircase—could be found excessive by a reasonable jury, as Plaintiff no longer posed a risk of flight. *Holliday v. City of Elizabeth*, Civ. A. No. 13-1006, 2018 WL 953346, at *10 (D.N.J. Feb. 20, 2018) (denying summary judgment on excessive force claim because "assuming Plaintiff's version, Plaintiff was not committing any offense, was not an immediate threat to the safety of [the officer], and was not attempting to flee"); *Shelton v. Bledsoe*, Civ. A. No. 12–1532, 2013 WL 1731351, *2–3 (3d Cir. Apr. 23, 2013) (denying summary judgment on issue concerning the use of force based on plaintiff's testimony in which he stated he was assaulted while fully restrained on the ground). Because genuine issues of fact exist at each stage of the *Graham* inquiry, summary judgment is not appropriate on Plaintiff's excessive force claim. *See Day*, 2013 WL 394151, at *9 (denying summary judgment on § 1983 excessive force claim because "[t]here simply are not enough undisputed facts for the Court to rely upon in order to determine if the Officer Defendants' actions were reasonable"). Therefore, the Court finds a dispute of material fact exists as to whether the officers violated Plaintiff's Fourth Amendment rights by using excessive force. *See Castellani v. City of Atl. City*, Civ. A. No. 13-5848, 2017 WL 3112820, at *9 (D.N.J. July 21, 2017) (denying summary judgment on excessive force claim, in part, because "a reasonable jury analyzing the

video could credit Plaintiff's version of the facts that Plaintiff was subdued and compliant on the ground as officers continued to beat, punch and kick him, and find that Defendants' conduct violated the Fourth Amendment").

The Court must also determine whether the violation of Plaintiff's Fourth Amendment right was clearly established. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howard*, 566 U.S. 658, 664 (2012)). "When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley*, 475 U.S. at 341). A district court "may not deny a summary judgment motion premised on qualified immunity without deciding that the right in question was clearly established at the time of the alleged wrongdoing." *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 n.4 (3d Cir. 2015).

Here, Plaintiff has raised genuine issues of material fact as to whether her Fourth Amendment right was clearly established. "The right to be free from an unprovoked beating is clearly established." *Hill v. Algor*, 85 F. Supp. 2d 391, 409 (D.N.J. 2000). Viewing the evidence in Plaintiff's favor, a reasonable officer could not have believed that wrestling Plaintiff to the ground, dragging her across her living room, and punching her in the head twice was lawful— especially when Plaintiff testified she was not resisting arrest and that she had not assaulted a police officer to necessitate the arrest in the first place. Denying summary judgment on Plaintiff's excessive force claim is certainly proper given the factual disparities presented by both parties. "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley v. Klem*, 298 F.3d 271, 278

(3d Cir. 2002); *Phong Duong v. Telford Borough*, 186 F. App'x 214, 216 (3d Cir. 2006) ("When there is a disputed question of material fact 'relevant to the immunity analysis,' granting summary judgment for the defendant on the basis of qualified immunity 'will be premature.'" (quoting *Curley*, 298 F.3d at 278)); *Morrison v. Phillips*, Civ. A. No. 06-812, 2008 WL 4308215, at *11 (D.N.J. Sept. 16, 2008) (finding genuine issues of material fact as to whether arresting officers used excessive force and noting "[o]nce the jury resolves [the factual questions regarding the constitutional violation from excessive force], the Court will be in a position to determine whether [the defendants] made a reasonable mistake of law and are entitled to qualified immunity" (citation omitted)). Accordingly, Defendants' Motion for Summary Judgment on Count I is **DENIED.**

### ii.    Plaintiff's § 1983 Failure to Intervene Claim

Plaintiff brings a § 1983 failure to intervene claim against Officer Foote, Officer Donnelly, and Officer Davis. (ECF No. 1 ¶¶ 37–41.) She asserts there "exists a genuine issue as to whether Defendants breached their duty to intervene and prevent the use of excessive force on Plaintiff's person." (ECF No. 19-1 at 13.)

A police officer "has a duty to take reasonable steps to protect a victim from another officer's use of excessive force, even if the excessive force is employed by a superior." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). For an officer "[t]o be liable under a failure to intervene theory, the plaintiff must have demonstrated that [her] underlying constitutional rights were violated, that the officer had a duty to intervene, and that the officer must have had a realistic and reasonable opportunity to intervene." *White v. City of Vineland*, Civ. A. No. 11608308, 2020 WL 6638579, at *6 (D.N.J. Nov. 12, 2020) (citing *Smith*, 293 F.3d at 650–51). "Thus, where a plaintiff is unable to establish a claim for excessive force, he cannot establish a claim for failure to intervene." *Coleman v. City of Long Branch*, Civ. A. No. 157314, 2018 WL

4027033, at *8 (D.N.J. Aug. 22, 2018) (citation omitted). Plaintiff has not satisfied this burden, as she has not demonstrated any of the officers had a "realistic and reasonable opportunity to intervene." *Smith*, 293 F.3d at 650–51.

The video footage indicates the encounter—from the time Plaintiff opened her door and began to backpedal, to when Plaintiff is restrained in handcuffs—lasted about forty seconds. (Ex A-1, (ECF No. 19-2) at 0:09:05–0:09:45.) During the encounter, Officer Foote testified he "stayed with [Plaintiff's husband] while [the other officers] were arresting [Plaintiff]" and "had his back to everything" taking place. (Foote Dep. (ECF No. 17-8) at 25:15–23.) While Plaintiff claims Officer Foote failed to intervene to prevent Officer Stybe from using excessive force against her, she does not establish that Officer Foote had a reasonable opportunity to do so. The evidence demonstrates Officer Foote was with Plaintiff's husband and did not have a reasonable opportunity to prevent Officer Stybe's alleged use of force, since he was not even watching Plaintiff's arrest take place. *See Davis v. Egbert*, Civ. A. No. 07-2135, 2010 WL 2326251, at *8 (D.N.J. June 7, 2010), *aff'd sub nom. Davis v. Beers*, 421 F. App'x 179 (3d Cir. 2011) (granting summary judgment on failure to intervene claim when defendant officer "was in the process of subduing Plaintiff's brother at the time Plaintiff was struck" because "[i]t was not realistic for [the defendant officer] to then leave Plaintiff's brother unattended" and, "[i]n light of the speed with which [the] events transpired . . . there was no realistic or reasonable opportunity for [the defendant officer] to intervene").

Additionally, Plaintiff claims Officer Donnelly failed to intervene to prevent Officer Stybe and Sergeant Friedman from using excessive force on Plaintiff. Further, she claims Officer Davis failed to intervene to prevent Officer Bennett from using excessive force on Plaintiff. As noted above, the video footage demonstrates the encounter lasted a matter of seconds, and both Officer

Donnelly and Officer Davis did not have a reasonable opportunity to intervene. *See Jacobs v. Cumberland Cnty.*, Civ. A. No. 16-1523, 2019 WL 2354473, at \*9 (D.N.J. June 4, 2019) (granting summary judgment on failure to intervene claim when defendant officer "delivered all three strikes against [the plaintiff] in rapid succession, in less than one second, without any apparent warning" because video footage "conclusively show[ed] that there was no realistic opportunity for any individual . . . to prevent [the defendant officer's] actions"). Moreover, while Officer Davis testified he saw Officer Bennett throw "one punch as fast as [the officer] came [into the house,]" (Davis Dep. (ECF No. 17-10) at 44:7–10), he took no action to stop the punch because "that would have been some real immediate action" as the punch happened "instantaneously." (*Id.* at 45:23–25, 46:1–6); *see La v. Hayducka*, 269 F. Supp. 2d 566, 581–82 (D.N.J. 2003) (granting summary judgment on failure to intervene claim because "it is unrealistic" to charge the defendant-officer "with the duty to intervene," especially "[c]onsidering the close proximity of the parties and rapidity of the events"); *Hartman v. Gloucester Twp.*, Civ. A. No. 12-2085, 2014 WL 2773581, at \*14 (D.N.J. June 19, 2014) ("The inquiry is whether the officer was in a position to see the violation and had a reasonable amount of time to intervene."). Therefore, the Court will grant Defendants' summary judgment motion on Plaintiff's failure to intervene claims against Officer Foote, Officer Donnelly, and Officer Davis.

This analysis applies despite the Court's denial of summary judgment on Plaintiff's excessive force claim. *See Coleman*, 2018 WL 4027033, at \*8 (D.N.J. Aug. 22, 2018) (noting that "even if [plaintiff] was subjected to excessive force, summary judgment would still be warranted with respect to the failure to intervene claim, because [plaintiff] has not established that [the defendant officers] had a realistic and reasonable opportunity to intervene"); *Ianuale v. Borough of Keyport*, Civ. A. No. 169147, 2018 WL 5005005, at \*9 (D.N.J. Oct. 16, 2018) (explaining that

"even if [the officer defendants had used excessive force,] the sequence of events . . . occurred too suddenly for an officer to intervene"). Accordingly, Plaintiff's failure to intervene claim is barred by qualified immunity, and Defendants' Motion for Summary Judgment on Count II is **GRANTED.**

### iii. Plaintiff's § 1983 Unlawful Policy or Custom, Failure to Train, Supervise and Discipline Claims

Count IV of Plaintiff's Complaint alleges §1983/*Monell* liability against Jackson Township for unlawful policies or customs as well as failure to train, supervise, and discipline, and Count V of Plaintiff's Complaint alleges § 1983 supervisor liability against Chief Kunz, Sergeant Freidman, and John Does 1-10 for failure to train, supervise, and discipline. To bring a claim against a municipality under § 1983, a plaintiff must assert a cause of action under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Specifically, a municipal entity may only be held liable under § 1983 if "the action that is alleged to be unconstitutional implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or came about "pursuant to governmental 'custom.'" *Marran v. Marran*, 376 F.3d 143, 156 (3d Cir. 2004) (quoting *Monell*, 436 U.S. at 690–91). Nevertheless, to properly maintain a *Monell* claim, a court must determine: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the municipality is responsible for that violation. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1149–50 (3d Cir. 1995). Similar to a § 1983 claim against an individual, a plaintiff may not maintain a derivative municipal claim if there is no constitutional violation in the first place. *Mulholland v. Gov't Cty. of Berks*, 706 F.3d 227, 238 n.15 (3d Cir. 2013).

Once a plaintiff identifies a municipal policy or custom, she must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of the Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997). If the policy or custom does not

facially violate federal law, causation may only be established by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Id.* at 407. "A showing of simple or even heightened negligence will not suffice." *Id.* For a § 1983 claim of failure to train or supervise municipal employees, a plaintiff must show that failure to provide training or supervision amounted to "'deliberate indifference' to the rights of persons with whom the employee will come into contact." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014). Deliberate indifference may be demonstrated either by showing a pattern of violations which puts the municipal employee on notice that a new program is necessary or a single incident violation where the need for training was patently obvious. *Id.* at 223.

Plaintiff argues there is sufficient evidence in the record to support her allegation "that unlawful customs, policies, practices, and/or procedures exist within Defendant Jackson Township's Police Department." (ECF No. 19-1 at 17.) Specifically, she argues Chief Kunz—the head of the internal affairs process at Jackson Township Police Department—never "inquired as to the status of the seven lawsuits filed against [him] and his subordinate officers." (*Id.* at 21.)

Jackson Township Police Department's Internal Affairs policy provides:

> It is the policy of the Jackson Township Police Department to accept and investigate all complaints of alleged officer misconduct or wrongdoing from any citizen, Department employee or any other source, including anonymous sources . . . . Internal affairs shall track the proceedings of any criminal or civil matters which officers of the Department are involved in as a complainant, plaintiff or defendant.

(Jackson Township Internal Affairs Policy (ECF No. 19-8) at 2–3.) Chief Kunz testified he is responsible for all the training, actions, and discipline of all the officers in the Jackson Township Police Department. (Kunz Dep. (ECF No. 17-7) at 8:11–24.) Accordingly, Plaintiff argues Chief Kunz "is the head of the Internal Affairs process and has the final say concerning all internal affairs investigations." (ECF No. 19-1 at 18.) While Jackson Township Police Department has an internal

affairs policy, genuine issues of material fact exist as to whether that policy was carried out with deliberate indifference. First, Chief Kunz testified internal affairs investigations are "not routinely" started when the Jackson Township Police Department receives notices of claims or potential claims. (ECF No. 17-7 at 27:8–11.) He also testified "a notice of tort claim, a civil—you know, civil claim would not necessarily trigger an internal affairs investigation." (*Id.* at 28:2–9; *id.* at 32:9–11 ("Again, I don't believe that the civil actions are necessarily automatic triggers for internal affairs investigations.").) Additionally, Chief Kunz testified, "just because somebody files a tort claim with the township clerk, that doesn't necessarily trigger an internal affairs investigation," (*id.* at 30:18–21), but an internal affairs investigation will be opened if a person specifically asks for one. (*Id.* at 27:12–23.) The evidence also indicates several lawsuits have been filed against the Jackson Township Police Department, all of which involved allegations of excessive force. (Prior Lawsuits Against Jackson Police Department (ECF Nos. 19-5, 19-6).) In response to these lawsuits, Chief Kunz testified no policy changes were made. (ECF No. 17-7 at 56:6–8 ("Yeah, I can't think at this moment that we made a department policy change based on civil actions.").) Importantly, Chief Kunz testified that despite these prior excessive force lawsuits, the Jackson Township Police Department does not track the outcomes of those lawsuits:

> Q: I'm talking about the police department. Does the police department have a policy of tracking the outcomes of these lawsuits?
> A: No, sir, I can't say that we track lawsuits in that fashion.

(ECF No. 17-7 at 42:14–18.) The interrogatories completed by the Jackson Township Police Department confirm this practice. (ECF No. 19-8 at 7 ("The Jackson Township Police Department does not track lawsuits.").) Additionally, when a lawsuit is initiated against the Department, it leaves internal affairs complaint investigations incomplete while litigation is pending. (ECF No. 17-7 at 23:7–23; 24:6–21.) Further, Chief Kunz testified he did not review any internal affairs reports in connection with this case (*id.* at 15:22–24.), and the internal affairs investigation for this

case has still not been completed. (*Id.* at 22:9–14.)

The Court finds Plaintiff has provided sufficient evidence from which a reasonable jury could find Jackson Township was deliberately indifferent in investigating claims of excessive force against its police department. Viewing the evidence in Plaintiff's favor as the nonmoving party, a reasonable jury could find Jackson Township had a custom of failing to properly investigate internal affairs complaints preceding this incident. *See Day*, 2013 WL 394151, at *11 (denying summary judgment on *Monell* claim when plaintiffs "stated a plausible claim that the customs of the Jackson Police Department, especially their allegedly lackadaisical internal affairs investigations related to excessive force, may have led to [plaintiff's] injuries at the hands of the Officer Defendants" because "a reasonable jury could find that Jackson's Internal Affairs procedures were part of a custom which showed deliberate indifference to rights of those who might interact with its officers"); *White v. City of Trenton*, Civ. A. No. 06-5177, 2011 WL 6779595, at *13 (D.N.J. Dec. 27, 2011), *on reconsideration in part*, 848 F. Supp. 2d 497 (D.N.J. 2012) (denying summary judgment on *Monell* claim when the plaintiff provided evidence that the Trenton Police Department "failed to fully implement a system to effectively track excessive force complaints" which created a situation where officers were "aware their conduct [would] most likely not be investigated and they [would] not be disciplined"); *Monaco v. City of Camden*, Civ. A. No. 04-2406, 2008 WL 8738213, at *8 (D.N.J. Apr. 14, 2008) (finding a jury could consider defendant's failure to investigate plaintiff's excessive force claim "until nearly three years after the incident took place as evidence of 'the existence of a municipal defendant's policy or custom' of failing to timely investigate claims of police misconduct" (quoting *Henry v. Cty. of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997))). Therefore, because a jury could reasonably infer Jackson Township Police Department had a custom of performing inadequate internal affairs

investigations, the Court will permit Plaintiff's claims in Count IV to proceed under a theory that her injuries resulted from the Jackson Township's failure to conduct meaningful investigations. *Noble v. City of Camden*, 112 F. Supp. 3d 208, 224 (D.N.J. 2015) ("The Court will therefore permit Plaintiff's *Monell* claim against the City to proceed under a theory that Plaintiff's injuries resulted from the City's failure to conduct timely and meaningful investigations into claims of excessive force.").

However, Plaintiff has not provided sufficient evidence to withstand summary judgment on her failure to train claim in Count V. To survive summary judgment on a failure to train claim, a plaintiff must "identify a failure to provide specific training that has a causal nexus with his or her injury" and additionally must demonstrate the failure to provide that training "can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations of the kind alleged occur." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991). A plaintiff's claim "is at its most tenuous" when it "turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). At best, Plaintiff submits that while Jackson Township Police Department provides use of force training twice a year, the officers are not given a test relative to this training. (ECF No. 17-13 at 30:1–20; ECF No. 17-12 at 15:5–25.) That is, Plaintiff has not provided proof indicating a specific training failure exists which can be causally connected to Defendants' actions. *See Day*, 2013 WL 394151, at *12 (granting summary judgment on failure to train claim because plaintiffs "failed to provide any proof to the Court indicating that a failure to train exists which can be causally connected to the actions of the Officer Defendants"); *Lapella v. City of Atl. City*, Civ. A. No. 10-2454, 2012 WL 2952411, at *6 (D.N.J. July 18, 2012); *Malignaggi v. Cty. of Gloucester*, 855 F. Supp. 74, 78 (D.N.J. 1994) (denying § 1983 failure to train claim because "Plaintiffs have failed to identify a specific training deficiency which caused the alleged violation").

Accordingly, Defendants' Motion for Summary Judgment on Count IV is **DENIED** and its Motion for Summary Judgment on Count V is **GRANTED.**

### B.    Plaintiff's State Law Claims

In Count III of her Complaint, Plaintiff alleges violations of the New Jersey State Constitution and New Jersey Civil Rights Act in connection with the same facts underlying her § 1983 excessive force and failure to intervene claims. This claim is brought against all the officers named in the § 1983 excessive force and failure to intervene claims: Officer Donnelly, Officer Stybe, Sergeant Friedman, Officer Foote, Officer Bennett, and Officer Davis.

NJCRA, N.J. Stat. Ann. § 10:6–1 *et seq.*, which was modeled after § 1983, creates a state law cause of action for violations of an individual's federal and state constitutional rights.[12] *Owens v. Feigin*, 947 A.2d 653, 655 (N.J. 2008). Section 10:6–2(c) provides a remedy against private and public defendants for a person who demonstrates that he has been deprived of

> any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law…

N.J. Stat. Ann. § 10:6–2(c); *see also Calan v. City of Jersey City*, Civ. A. No. 16-9008, 2017 WL 1135231, at *2 (D.N.J. Mar. 27, 2017).

---

[12] The "NJCRA is interpreted as analogous to § 1983," *Szemple v. Correctional Med. Servs., Inc.*, 493 F. App'x 238, 241 (3d Cir. 2012), and a court "will analyze . . . NJCRA claims through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 444 (D.N.J. 2011); *see Estate of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 245 n.4 (3d Cir. 2016) (holding that "it appears undisputed that [p]laintiffs' claims under the New Jersey Constitution and the New Jersey Civil Rights Act trigger the same legal elements and principles as . . .[the] federal causes of action [under Section 1983]"); *Oliveira v. Borough of N. Arlington*, Civ. A. No. 15-7717, 2017 WL 1368789, at *1 (D.N.J. Apr. 10, 2017).

As discussed, the Court has concluded Plaintiff's § 1983 claim for excessive force can proceed, but her § 1983 failure to intervene claim cannot. Therefore, as Plaintiff's rights under the New Jersey State Constitution parallel her federal rights, Plaintiff has demonstrated sufficient evidence on which a jury could find in her favor under the NJCRA for her excessive force claim, but not her failure to intervene claim. *Nieves v. Ortiz*, Civ. A. No. 06-5206, 2008 WL 4004940, at *12 (D.N.J. Aug. 20, 2008).

Accordingly, Defendants' Motion for Summary Judgment on Count III is **DENIED** as it relates to Plaintiff's § 1983 excessive force claim but is **GRANTED** as it relates to Plaintiff's § 1983 failure to intervene claim.

IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**. An appropriate order follows.

*/s/ Brian R. Martinotti*
**BRIAN R. MARTINOTTI**
UNITED STATES DISTRICT JUDGE

Dated: June 22, 2021